John N. **LANGENFELD**, Plaintiff,

v.

**STOELTING, INC.,** Defendant.

No. 94–C–303.

United States District Court, E.D. Wisconsin.

Oct. 23, 1995.

Thomas G. Halloran, Michael R. Fox, Fox & Fox, Madison, WI, for Plaintiff.

James W. Greer, Jr., Gwendolyn G. Connolly, Whyte Hirschboeck & Dudek, Milwaukee, WI, for Defendant.

## DECISION AND ORDER

RANDA, District Judge.

This age discrimination case is before the Court on defendant's motion for summary judgment. On October 6, 1995, the Court informed the parties that it intended to grant defendant's motion, obviating the need for an upcoming pretrial conference, and that a written decision granting the motion and explaining the Court's reasoning would issue

shortly. The following constitutes the Court's Decision and Order in this matter.

## PROCEDURAL BACKGROUND

Before detailing the undisputed facts, it is important to note the procedural context of the record from which the Court must draw these facts. That is, defendant supports its motion, and the factual predicates underlying the same, with substantial evidentiary materials, including detailed affidavits and deposition transcripts from the parties and corporate officers involved. Based on these submissions, and pursuant to Local Rule 6.05, defendant also submitted separately numbered proposed findings of fact. Under Rule 6.05, plaintiff was required to submit "[a] specific response to the movant's proposed findings of fact, clearly delineating *only* those findings to which it is asserted that a genuine issue of material fact exists. *The response must refer to the contested finding by paragraph number and must cite evidentiary materials which support the claim that a dispute exists.*" Local Rule § 6.05(b)(1) (emphasis supplied). Moreover, "[i]n deciding a motion for summary judgment, the court will conclude that there is no genuine material issue as to any proposed finding of fact to which no response is set out." Local Rule § 6.05(d). Plaintiff has not satisfied his obligations under rule 6.05.

█ Plaintiff sufficiently responded to proposed Findings Of Fact ¶¶ 1–22, adopted and listed below, insofar as plaintiff stated that he had no objection to these factual propositions. (Plaintiff's Brief in Opposition at 2.) However, as regards proposed Findings of Fact ¶¶ 23–57, also adopted and listed below, plaintiff submitted the following:

> Plaintiff objects *generally* to the proposed Findings of Fact of defendant from paragraphs 23 through 57 inclusive, relating to "Stoelting moves to replace lost business" and "the down sizing of Stoelting". Those proposed Findings of Fact are the pretext for Langenfeld's termination based on age. Plaintiff will cite specific paragraphs where applicable in the arguments set forth below.

(Id.; emphasis supplied.) The foregoing does not comply with Rule 6.05. Plaintiff cannot object "generally" to 35 individually proposed findings of fact. Rather, plaintiff must specifically and separately respond to each disputed finding of fact by number, and each specific response must include specific factual citations from the record supporting the existence of the claimed dispute. The purpose of such a rule is obvious. By the time a case reaches summary judgment, the parties should have undertaken the bulk, if not all, of their discovery efforts, and the factual record should be fairly established. Accordingly, the parties should be able to clearly isolate for the Court the specific factual issues remaining for trial and the evidence supporting their respective positions on each issue. This not only enables the Court to make its summary judgment determination, but it also forces the parties to marshal the facts and begin preparing for trial.

Plaintiff's responses make a good case for the strict enforcement of the local rule. Plaintiff makes a "general[ized]" objection to 35 individual findings of fact, some of which are critical to the summary judgment determination. While he does state that he "will cite specific paragraphs where applicable in the arguments" set forth in his brief, the only specific paragraph he refers to in his brief is ¶ 41, which asserts that defendant undertook a reduction-in-force on February 13, 1993, resulting in the termination of roughly 20% of its administrative personnel. Plaintiff also makes general references to certain deposition transcripts attached to his counsel's affidavit, but he does not explain how those transcripts raise genuine issues of fact concerning the 34 other proposed findings he has "generally" objected to. Indeed, after reviewing plaintiff's brief and the transcripts he submits in support thereof, the only factual points he attempts to establish are (1) his termination worked no real reduction in the number of people at his level or position; (2) he was fired for economic reasons outside of is control and was therefore the most qualified employee for a new position simultaneously given to a new, younger employee; and (3) the new, younger employee hired for the position he was denied has not performed any better than he did. Some of these prop-

ositions are not supported by the evidence and others are simply immaterial. Moreover, plaintiff basically leaves it for the Court to figure out which specific findings of fact are implicated or affected by these factual propositions.

In light of the foregoing, the Court proceeds as follows: The plaintiff's failure to specifically respond to each proposed finding of fact means that the Court will accept defendant's proposed findings of fact as true and incorporate those into its decision. Such is expressly provided for in Local Rule 6.05(d). It is also clearly implied in Fed. R.Civ.P. 56(e), which provides that "[w]hen a motion for summary judgment is made and supported as provided in this rule, ... the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." However, not to dismiss out-of-hand the few factual submissions and arguments which the plaintiff does attempt to establish, the Court will address the factual points raised above and explain why those propositions are either *immaterial* or lack sufficient support in the record. Where the Court relies upon facts not set forth in its formal Findings of Fact, the Court will cite to the appropriate evidentiary source.

## FACTS

1. John N. Langenfeld ("Langenfeld") is an adult resident of the state of Wisconsin, who lives at 444 South Lake Street, Elkhart Lake, Wisconsin. His date of birth is August 2, 1938. (Plaintiff's Complaint at ¶ 4.)

2. Stoelting, Inc. ("Stoelting") is a Wisconsin corporation with its principal place of business at 502 Highway 67, Kiel, Wisconsin. (Complaint at ¶ 5.)

3. The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that plaintiff alleges a claim based upon the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA").

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391 in that the defendant resides in the Eastern District of Wisconsin.

5. Stoelting is a manufacturer of industrial washers and dryers, dairy processing equipment and commercial products. It is best known for its soft serve and slush machinery. (Huggins Dep. at 9.) [1]

6. Stoelting is organized into divisions along product lines. There were initially four divisions: the dairy division, the industrial washer and dryer division, the slush division and the soft serve division. In 1990 the slush and soft serve divisions were merged into the commercial products division. (Stoelting Aff. at ¶ 2.)

7. The commercial products division manufactures soft serve ice cream machinery and slush freezers ("soft serve products") for use in the specialty slush and soft serve ice cream retail trade. (Stoelting Aff. at ¶ 3.)

8. These products are sold primarily through a network of independent distributors located throughout the United States. An exception is made for larger accounts, such as Dairy Queen, which are sold directly by a national accounts sales representative. (Stoelting Aff. at ¶ 4.)

9. For marketing purposes, the commercial products division was organized into territories along regional lines. The territories, which were redefined from time to time, were generally referred to as the eastern, southern, midwestern and western regions. (Stoelting Aff. at ¶ 5.)

10. A sales representative, referred to as a regional sales manager, was employed to sell soft serve products in his or her territory. (Stoelting Aff. at ¶ 6.)

11. The duties of the regional sales manager, who reported to the vice president of marketing and sales, involved the marketing and sale of soft serve products through the establishment of independent distributorships, the training of distributors, and visits to the distributors to ensure that Stoelting products were being sold and serviced properly. (Stoelting Aff. at ¶ 7.)

---

**1.** Cited excerpts from the deposition of Marion Huggins are attached as Ex. A to the Affidavit of James W. Greer dated July 6, 1995, and are cited as "Huggins Dep. at ___."

12. Langenfeld first joined Stoelting in 1978 when he was hired as a field sales manager in the soft serve division. (Langenfeld Dep. at 9.)[2]

13. In 1983 the soft serve division was reorganized into an eastern and western region and Langenfeld was assigned the position of western regional sales manager. (Langenfeld Dep. at 14.)

14. In 1984 the soft serve division was reorganized into eastern, midwestern and western regions and Langenfeld was assigned the position of midwest regional sales manager, a position he held until the position was eliminated as part of the Stoelting work force reduction in February of 1993. (Langenfeld Dep. at 16.)

15. In 1986 the soft serve division was reorganized and a fourth territory, the southern region, was added. (Langenfeld Dep. at 24.)

16. Langenfeld's duties, first as a field sales manager and later as a regional sales manager, did not change except that his assigned territory became smaller as new salesmen were hired and new regional territories were created. (Langenfeld Dep. at 17–18.)

17. The performance of each regional sales manager was reviewed annually by Stoelting.

18. Langenfeld was given his last annual performance review in February of 1992 by Bill Perrow ("Perrow"). (Langenfeld Dep. at 110.)

19. Perrow concluded, among other things, that Langenfeld's "sales were very low in regard to his sales goals in 90/91 and [he] is far behind this [91/92] year." (Langenfeld Dep. at 112; Greer Aff., Ex. C.) Langenfeld was also advised that he needed "to improve [his] distributor organization by appointing, upgrading and replacing distributors." (Langenfeld Dep. at 113.)

20. Approximately nine months later, the new vice president of marketing and sales, Rudy Hoch ("Hoch"), advised Langenfeld in correspondence dated November 27, 1992 that "in reviewing your past performances, I have no confidence in you reaching the quotas submitted. Your last three years average performance has been just over 40% [of your sales quota]." (Langenfeld Dep. at 119–120; Greer Aff., Ex. D.)

21. Langenfeld's sales of soft serve equipment for the last four years of his employment were as follows:

| Fiscal Year | Sales ($000) |
| --- | --- |
| 88–89 | $2,190 |
| 89–90 | 1,566 |
| 90–91 | 786 |
| 91–92 | 508 |

(Stoelting Aff. at ¶ 8.)

22. Hoch informed Langenfeld in interoffice correspondence dated December 15, 1992, that "unless you can achieve a higher level of performance with all the years experience, we will have to take a closer look as to how we will get the job done. Another candidate would be a solution." (Langenfeld Dep. at 122–123; Greer Aff., Ex. E.)

23. Throughout its long history, Stoelting had operated on a profitable basis. At fiscal year ending August 31, 1990 Stoelting reported net sales of $24,834,000 and net profits of $1,088,000. (Stoelting Aff. at ¶ 9.)

24. By fiscal year ending August 31, 1991 Stoelting had sustained an extraordinary loss of business: Its net sales had dropped 44% from $24,834,000 to $13,951,000. The loss of sales resulted in a net loss of $2,361,000 for the year. (Stoelting Aff. at ¶ 10.)

25. In an effort to adjust to decreasing sales, in March 1991 there was a layoff of 13 administrative people. Additionally, a moratorium in hiring was instituted and during 1991, as 10 administrative employees resigned or retired, they were not replaced. The job duties of the personnel that were laid off, resigned or retired were redistributed and absorbed by the remaining personnel. (Stoelting Aff. at ¶ 11.)

26. In March 1991 Marion Huggins ("Huggins") was hired as the chief operating

---

**2.** Cited excerpts from Langenfeld's deposition are attached as Ex. B to the Greer Affidavit and are cited as "Langenfeld Dep. at ___."

officer of the company. He was 52 years old at the time. (Huggins Aff. at ¶ 2.)

27. One of Huggins' primary assignments was to improve the company's financial condition by increasing sales to replace the extraordinary loss of business incurred during the prior year. (Huggins Aff. at ¶ 3.)

28. Huggins began almost immediately to look for a vice president of marketing and sales. This position had been vacant since April of 1991. Huggins met Hoch, who was working for a competitor, at a trade show and offered him the position. Hoch was 50 years old at the time. (Huggins Aff. at ¶ 4.)

29. Hoch joined Stoelting on October 5, 1992. His responsibility was to expand sales to replace the lost business. He was also directed to fill the vacant southern regional sales manager position. (Huggins Aff. at ¶ 5.)

30. The southern regional sales manager position had been vacant since March of 1991. Perrow, who resided in New Jersey, had been covering both the eastern and southern regions. (Huggins Aff. at ¶ 6.)

31. In December of 1992 Hoch hired Kathy Ely ("Ely") to be the southern regional sales manager. Hoch knew Ely because she had worked with him at a competitor of Stoelting. She offered the prospect of immediate sales for Stoelting. Her sales territory for the competitor included states in both the eastern and southern regions. Ely, who was 44 years old at the time, lived in Erie, Pennsylvania. (Huggins Aff. at ¶ 7.)

32. Perrow resigned in January of 1993, shortly after Ely was hired. (Huggins Dep. at 21, 31–32.)

33. Following Perrow's resignation, Ely assumed sales responsibility for both the eastern and southern regions. (Huggins Dep. at 27–28.)

34. Ely then recommended Michelle Jen ("Jen") for the southern regional sales manager position. (Huggins Dep. at 38.)

35. Jen offered the prospect of immediate sales for Stoelting. She already had a good working relationship with the network of distributors in the southern region because of her work as a sales representative for a product that is used in the soft serve machine. She had also previously worked in the south for Dairy Queen, a major customer of Stoelting, and was familiar with soft serve equipment. (Huggins Dep. at 33–34.)

36. Shortly thereafter, in January of 1993 Hoch recruited Jen for the southern regional sales manager position. Jen, who was 32 years old at the time, lived in Jacksonville, Florida. (Huggins Dep. at 28.)

37. In view of the continuing severity of the financial situation, Huggins was forced to significantly reduce overhead expenses by consolidating the functions of the company's administrative staff and by reducing the total number of administrative employees. (Huggins Aff. at ¶ 8.)

38. In late 1992 and early 1993 Huggins talked with each of his functional managers in order to determine how the company's expenses could be reduced. Those discussions included the combination and elimination of functions and how things could be done better with equal or less money. (Huggins Dep. at 39–40.)

39. With respect to the sales functions, Huggins and Hoch concluded that three sales positions could be eliminated and the duties combined with other positions without adversely affecting the company's sales efforts. Those positions were: (1) the midwest regional sales manager, commercial products division; (2) the sales manager, dairy division; and (3) a sales clerk, commercial products division. (Huggins Aff. at ¶ 9.)

40. Huggins' discussions with Hoch and his other functional managers lead to an administrative work force reduction. (Huggins Dep. at 39–40.) The RIF resulted in the discharge of the following administrative staff members on February 15, 1993:

[redacted] 

| NAME | POSITION | DOH | AGE AT TERMINATION |
|---|---|---|---|
| Gary Anhalt | Plant Supervisor | 1/24/80 | 36 |
| Joe Brachman | Tool Room Supervisor | 4/10/89 | 62 |
| Burl Cavanaugh | Accounting Manager | 12/1/77 | 48 |
| Debra Drone | Buyer | 11/14/77 | 39 |
| Kevin Fredrich | Engineer | 1/27/89 | 38 |
| Bonnie Goetsch | Acts. Payable | 7/17/72 | 38 |
| David Heimerman | Engineer | 8/28/73 | 44 |
| Joseph Krupka | M.I.S. Manager | 9/19/77 | 57 |
| John Langenfeld | Sales Manager | 1/4/78 | 54 |
| James Maas | Buyer | 9/14/87 | 38 |
| Gary Pauly | Engineer | 12/7/87 | 44 |
| Fred Rehm | Sales Manager | 3/1/83 | 37 |
| Kathy Roehrig | Purchasing Expeditor | 4/3/84 | 43 |
| Rodney Schmahl | Engineer | 12/26/79 | 38 |
| Bill Trowbridge | Drafting | 4/7/80 | 38 |
| Shelly Becker | Sales Clerk | 9/1/92 | 20 |

(Huggins Aff. at ¶ 10.)

41. The February 15, 1993 RIF, which represented approximately 20% of the administrative work force, consisted of seven employees over the age of 40 and nine employees under the age of 40. (Huggins Aff. at ¶ 11.)

42. The eliminated sales positions were held by Shelly Becker, age 20, Fred Rehm ("Rehm"), age 37, and Langenfeld, age 54. (Huggins Aff. at ¶ 12.)

43. With respect to the dairy division, Huggins and Hoch believed that, from an operational standpoint, the sales manager position, which was held by Rehm, was one that could be eliminated and the duties combined without adversely affecting the company's sales efforts. (Huggins Aff. at ¶ 13.)

44. The duties of the sales manager, dairy division, were combined with other positions. Joe Palus, the marketing manager, assumed most of the responsibilities for the position. He was 53 years old at the time. (Huggins Aff. at ¶ 14.)

45. Tom Jehn, the vice president of engineering, also assumed some of the responsibilities for the position. He was 45 years old at the time. (Huggins Aff. at ¶ 15.)

46. With respect to the commercial products division, Huggins and Hoch believed that, from an operational standpoint, the midwest regional sales manager position, which was held by Langenfeld, was one that could be eliminated and the duties combined with other positions without adversely affecting the company's sales efforts. (Huggins Dep. at 41–45.)

47. The duties of the eliminated midwest regional sales manager position were combined with other positions. Hoch, the vice president of marketing and sales and Langenfeld's superior, assumed the primary responsibility for the distributors in the midwestern region. (Huggins Dep. at 42–43.) He was 50 years old at the time.

48. Phil Davis, marketing manager of the commercial products division, took over the technical service and training duties of the position. (Huggins Dep. at 42–43.) He was 45 years old at the time.

49. Davis' usual duties involved sales training and the more technical aspects of marketing the company's products. Davis, unlike Langenfeld, is a degreed engineer and provides the technical support for the company's marketing efforts and assists the engineering department. (Huggins Aff. at ¶ 16.)

50. Jane Dutter, the national accounts sales manager, assumed responsibility for the day-to-day equipment orders from the distributors in the region. She was 39 years old at the time. (Huggins Aff. at ¶ 17.)

51. The regional sales managers in the commercial products division were as follows:

| Region | Sales Manager | Age |
|--------|---------------|-----|
| Eastern | Ely | 44 |
| Southern | Jen | 32 |
| Midwest | Langenfeld | 54 |
| Western | Foley | 56 |

(Huggins Aff. at ¶ 18.)

52. The only regional sales manager under the age of 40 was the recently recruited Jen, who began working on February 28, 1993, as the southern regional sales manager. (Huggins Aff. at ¶ 19.)

53. Langenfeld was not considered for the southern regional sales manager position for a number of reasons. Langenfeld, who had resided in Elkhart Lake, Wisconsin, for 24 years, was not established in the region nor did he have "currency" with the distributors in the southern region. The company needed to move quickly to expand its sales in the southern region and Langenfeld was not considered to be the best suited person for the task. (Huggins Dep. at 60–62.) Jen, who had just been recruited and was already living in the south, was established with the distributor network in the southern region and offered, as previously stated, the prospect of immediate sales. (Huggins Aff. at ¶ 20.)

54. Langenfeld also was not considered because neither Huggins or Hoch was satisfied with his performance. He had been recently criticized for his performance in a territory he had had for some eight or nine years. In their judgment he would be even less suited for a less familiar, more distant territory. (Huggins Aff. at ¶ 21.)

55. Langenfeld admits that he has no knowledge or evidence that any sales representative in the commercial products division, including the individuals who assumed the responsibilities of his former position, were left in their positions or hired because of their age. (Langenfeld Dep. at 109.)

56. Langenfeld admits that he has no evidence or information which would establish that he was denied any of these positions because he was older than they were. (Langenfeld Dep. at 109.)

57. On January 15, 1994, Langenfeld started his own company called "Lynfield Marketing Group" which is a manufacturer's representative for the food service industry. (Langenfeld Dep. at 57.) He currently represents three lines of equipment: PureMark, USA, Frosty Factory of America, and Dreaco Products Incorporated. (Langenfeld Dep. at 57–58.)

## LAW

### I. SUMMARY JUDGMENT STANDARDS

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Summary judgment is no longer a disfavored remedy. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.,* at 327, 106 S.Ct. at 2554. It "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *United Food and Commercial Workers Union Local No. 88 v. Middendorf Meat Co.,* 794 F.Supp. 328, 330 (E.D.Mo.1992). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). While a *material* fact is one that is "outcome deter-

minative under the governing law", *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir.1990), a *genuine* issue as to that material fact is raised only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

The question whether a material issue of fact is *genuine* necessarily requires "some quantitative determination of sufficiency of the evidence." Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court*, 116 F.R.D. 183, 186 (1987). "Of course, a court still cannot resolve factual disputes that could go to a jury at trial, ... [b]ut no longer need the trial court leave every sufficiency issue for trial or a later directed verdict motion." *Id.* Rather, the standard for summary judgment is now the same as that for a directed verdict: "[W]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12. "A district judge faced with [a summary judgment motion] must decide, subject of course to plenary appellate review, whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict. If not, the motion should be granted and the case dismissed." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572–73 (7th Cir.1989) (citations omitted). Thus, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corporation*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). "[A] party must produce 'specific facts showing that there remains a genuine issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed." *Branson v. Price River Coal Company*, 853 F.2d 768, 771–72 (10th Cir.1988). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11. Thus, "[a] party to a lawsuit cannot ward off summary judgment with an affidavit or deposition based on rumor or conjecture. 'Supporting and opposing affidavits shall be made on personal knowledge,....' " *Palucki*, 879 F.2d at 1572 (7th Cir.1989). Such principles insure that summary judgment is utilized "when it can be shown that a trial would serve no useful purpose." *Windham v. Wyeth Laboratories, Inc.*, 786 F.Supp. 607, 610 (S.D.Miss.1992).

## II. THE ADEA

The legal standards governing ADEA claims are well-established. "[A] terminated plaintiff's ultimate burden in an age discrimination case is to prove that he was discharged because of his age." *Oxman v. WLS–TV*, 846 F.2d 448, 452 (7th Cir.1988), citing *La Montagne v. American Convenience Prods., Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984). "The plaintiff need not prove that age was the sole factor motivating the employer's decision, only that age was a determining factor in the sense that he would not have been fired but for the employer's motive to discriminate on the basis of age." *Id.* Where there is no direct or circumstantial evidence of age discrimination, the Court applies a burden-shifting analysis. *Id.* Under that analysis, "a plaintiff carries the initial burden of establishing a prima facie case [of age discrimination]." *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 462 (7th Cir.1986). In discharge cases, this requires the showing of four elements:

In order to establish a prima facie case under the ADEA, a plaintiff must show (1) that he belongs to the protected class, (2) that his job performance was sufficient to meet his employer's legitimate expectations, (3) that he was discharged in spite of his performance, and (4) that the employer sought a replacement for him.

*Id.*

"A prima facie case is not a complete shield against summary judgment." *Herman v. National Broadcasting Co.*, 744 F.2d 604, 608 (7th Cir.1984). Once a prima facie case is made, "the burden shifts to the [employer] to articulate a legitimate non-discriminatory reason for the discharge." *Dale*, 797 F.2d at 463. "This burden, however, is merely a burden of production, ... that is

not difficult to satisfy." *Id.* "Once the defendant articulates a nondiscriminatory, legitimate reason for its actions, the presumption of discrimination dissolves and the burden shifts back to the plaintiff to prove that the defendant's proffered reasons are pretextual." *Oxman,* 846 F.2d at 453. "The plaintiff can do so by showing either that a discriminatory reason more likely than not motivated the employer or that the employer's proffered explanation is incredible." *Id.*

## III.  APPLICATION

■ Stoelting assumes, for summary judgment purposes, that Langenfeld can establish a prima facie case of age discrimination.  Under the foregoing principles, this shifts the burden of production to Stoelting to articulate a legitimate, non-discriminatory reason for terminating Langenfeld.  Stoelting meets this burden.  Stoelting states that it terminated Langenfeld as part of a company-wide reduction-in-force.  The burden therefore shifts back to Langenfeld to create a genuine issue of material fact as to whether or not the reason proffered by Stoelting is pretextual.  Langenfeld attempts to meet this burden by raising the factual propositions discussed earlier.  This attempt fails.  For the following reasons, the Court finds that none of these factual propositions create a *genuine* issue of *material* fact.

### A.  Reduction-in-Force

■ Langenfeld relies heavily upon the argument that, regardless of how many other administrative positions may have been eliminated due to the reduction-in-force which undeniably occurred on February 15, 1993, his position was not eliminated and therefore his termination was not part of the reduction-in-force.  In support of this position, he relies upon a clear misinterpretation of an otherwise innocuous fact.  That is, shortly before Langenfeld's termination, there were three regional sales managers in his division, and shortly after his termination, there were still three regional sales managers in his division.  Therefore, Langenfeld argues, Stoelting did not eliminate a regional sales manager's position as part of its reduction-in-

force and did not realize any savings as a result of Langenfeld's termination.

Considering the foregoing fact in isolation from all the other facts of record, one could draw the inference of pretext.  However, once the Court considers this fact in the context of the other facts, it becomes clear that such an inference is patently incorrect and unreasonable.  The reason there were only three regional sales managers in Langenfeld's division shortly before his termination is because the fourth regional sales manager's position became vacant when Bill Perrow, the manager of the eastern region, quit in early 1993.  (Huggins Dep. at 26–28.)

The undisputed facts are as follows:  Since 1986, the soft serve division in which Langenfeld worked has been divided into four regions—eastern, southern, midwestern and western.  (FOF at ¶ ¶ 9, 15.)  When Hoch was hired in October, 1992, there were only three regional sales managers covering these four territories.  The southern regional sales manager position had been vacant since March of 1991, and Bill Perrow, who was the eastern regional sales manager, had been covering both the eastern and southern regions.  (FOF at ¶ 30.)  In mid-to-late summer, 1992, Huggins, as part of his efforts to review and improve Stoelting's marketing, determined that the Southeast was an area of great opportunity for Stoelting and that the company had not adequately targeted that region in its marketing efforts.  (Huggins Dep. at 34–35, 58.)  Accordingly, Huggins, and later Hoch, began searching for someone to fill the vacant regional sales manager position for the southern region.  (FOF at ¶ 29; Huggins Dep. at 34–35.)  This search resulted in the hiring of Kathy Ely in late–1992, who previously worked for a competitor of Stoelting and had represented that competitor in both the eastern and southern regions.  (Huggins Dep. at 33–35; FOF at ¶ 31.)  Ely was given responsibility over several southern states which had previously been part of the region covered by Bill Perrow.  (Huggins Dep. at 27–28.)  Therefore, once Ely was hired, Stoelting had four regional sales managers in the soft serve division, including Langenfeld, who covered the midwest region.

This would soon change, however. Beginning in or around December, 1992, Huggins began meeting with his managers in an effort to target functions or positions which could be eliminated and/or combined with other positions in order to reduce the company's cost of doing business. (FOF at ¶¶ 37–38; Huggins Dep. at 39–40.) During that review, it was determined that Stoelting did not need a midwest regional sales manager, because the company was headquartered in the midwest (Kiel, Wisconsin) and could service and solicit its midwestern customers from that location with existing staff. (Huggins Dep. at 43–45; FOF at ¶ 46.) Therefore, a decision was made to terminate Langenfeld as part of the reduction-in-force, spread his duties between three other existing employees located at the company's offices in Kiel, and thereby reduce from 4 to 3 the number of regional sales managers in the soft serve division. (Huggins Dep. at 39–40, 42–45; FOF at ¶¶ 39–42; 46–50.) However, before that decision could be formalized and carried out, Bill Perrow left the company, upset over the fact that he had lost the southern region to Ely. (Huggins Dep. at 26–28.) Therefore, on a temporary basis, Stoelting had Ely take immediate responsibility for Perrow's eastern region in addition to the southern region. (Huggins Dep. at 26–28, 59–60; FOF at ¶ 33.) This had the effect of reducing from 4 to 3 the number of regional sales managers. However, absent the termination of Langenfeld, that reduction would not have been permanent, because Stoelting quickly hired a new southern regional sales manager, Michelle Jen, in February, 1993. (Huggins Dep. at 32–34, 59–61; FOF at ¶¶¶ 34–36.) Jen took over the southern region from Ely, who was then left with only the eastern region. (Id.) The reduction-in-force occurred almost simultaneously (February 13, 1993). (FOF at ¶¶ 40–41.) Had there been no reduction-in-force, and had Langenfeld not been part of the reduction, Jen's hiring would have left at 4 the number of regional sales managers in the soft serve division. Langenfeld's termination therefore resulted in a real reduction-in-force and a real savings to Stoelting.

Langenfeld offers nothing in the way of facts or argument disputing the sequence or substance of the events described above. Those events clearly show that the fact that there were three regional sales managers in the soft serve division shortly before and after Langenfeld's termination was simply the innocent result of the timing of Perrow's decision to quit and Stoelting's decisions to terminate Langenfeld and hire Jen. It does not create a *genuine* issue of material fact concerning whether Langenfeld was terminated as part of a genuine reduction-in-force. On the current record, Langenfeld's argument is a less-than-forthright representation of the underlying facts, one which no reasonable jury could rely upon to rule in Langenfeld's favor.

## B. Jen's Hiring

Even assuming he was terminated as part of a reduction-in-force designed to eliminate the midwest regional sales manager position, Langenfeld argues that he was the most qualified person to take over the newly-filled southern regional sales position, and that Stoelting's decision to hire a 32–year old for that position without even offering the position to Langenfeld is evidence that he was terminated because of his age. As evidence that he was the best qualified for the southern regional sales position, Langenfeld cites the fact that Jen had no prior experience selling Stoelting equipment, that Langenfeld was fired for purely economic reasons, that those economic reasons were largely outside of his control, and that Stoelting's president issued Langenfeld a favorable letter of recommendation, stating that he "would certainly recommend John Langenfeld for a sales position consistent with his previous experience." (Rice Aff. at Ex. 4.) However, the southern regional sales position was not necessarily "a sales position consistent with [Langenfeld's] previous experience." Langenfeld's previous experience was concentrated in the midwest region. In fact, Huggins cited Jen's background and "currency" in the southern region as the most important consideration in his decision to hire Jen and not Langenfeld:

Q: And can you tell me the reason or reasons that Ms. Jen was hired?

A: Miss Jen was hired because she had an excellent background that seemed to be conducive to aiding us in our sales effort in the Southeast. She had a background of having grown up as a child in a Dairy Queen-owned family.[3] What I mean by that is a family that ran Dairy Queen organizations or restaurants.

She had firsthand knowledge of what it's like to work in a retail organization that's going to use machines that we manufactured.

Q: She could make a soft serve ice cream cone, right?

A: She could probably make anything that a Dairy Queen could make. She also had spent a number of years as an international Dairy Queen employee as a field rep. She had, therefore, firsthand knowledge of working with other Dairy Queen owners in a geographic area and helping them in running their business and so forth.

Q: Do you know what geographic area Ms. Jen worked for Dairy Queen?

A: In the North—I mean in the Southeast somewhere, but I can't tell you exactly what her state responsibilities were.

She also had worked for a number of years as a mix company representative. A mix company is an organization that supplies the mix that goes into our machines that makes the product. And she had done that in the Southeast as well.

\* \* \* \* \* \*

Q: I understand. Because of Mr. Langenfeld's knowledge of the industry and the products that Stoelting sold, was there ever any consideration made to offer the Southern region that Michelle got to Mr. Langenfeld?

A: None whatsoever.

Q: Any reasons for that specifically that you can recall?

A: Sure, I can tell you why. Because whenever you're in a situation like we were in—and I've described that for you in the past.

Q: Correct. Don't repeat what you said.

A: And I'm not. And I find a Michelle like a Michelle Jen who's got the background that Michelle Jen has and who has the currency—and I'm going to use the word "currency", currency meaning that she knows these people in this geography from dealing with them for a relatively long period of time—there's where I'm going to get an individual who's got currency in the region, got currency with the people, got currency with the products and is going to get me more sales quicker than most anybody else I'm going to find.

If I take a John Langenfeld, who is residing in Wisconsin, who doesn't have currency in this area, John is not going to get me the sales as fast as I need them, not as fast as Michelle Jen is going to get them.

(Huggins Dep. at 33–34, 60–61; FOF at ¶¶ 35, 53.)

The foregoing explanation is certainly reasonable. On its face, there is no reason to reject the explanation as patently incredible or pretextual. At best, Langenfeld creates a dispute of fact concerning whether Huggins' reasoning for hiring Jen was correct or represented sound business judgment, but it does not create an issue of fact concerning the sincerity of his reasoning. This distinction is key. As the 7th Circuit has stated on several occasions, a federal court in a Title VII or ADEA action does not sit as a super-personnel department second-guessing the economic wisdom of an employer's hiring and firing decisions. *See e.g., Krystof v. Hyatt Corp.*, 827 F.Supp. 490, 495–96 (N.D.Ill.1993), quoting *Smith v. General Scanning, Inc.*, 876 F.2d 1315, 1321 (7th Cir.1989). Rather, the Court is only concerned with whether the employer gave an honest, non-discriminatory explanation for his or her behavior. *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988). Langenfeld has produced no evidence questioning the sincerity of Huggins' asserted rationale as to why he felt Jen was more qualified for the position. Absent such evidence, the facts concerning

3. Dairy Queen is a major customer for Stoelting's soft serve division. (FOF at ¶ 35.)

his own qualifications do not raise a genuine issue of material fact.

### C. Jen's Performance

Finally, Langenfeld argues that Jen has done no better in her current position than he was doing in his previous position, further casting doubt on Stoelting's assertion that Jen was more qualified. But as argued in Stoelting's Reply Brief, it appears that Langenfeld has misinterpreted the facts underlying this argument in that Jen's performance actually exceeded Langenfeld's. (Stoelting Reply Brief at 8.) The Court need not resolve this dispute, however, because it is immaterial. The question is not whether Jen lived up to Stoelting's expectations after she was hired. The question is whether Stoelting honestly had those expectations at the time Jen was hired and whether those expectations provided the basis for hiring Jen over Langenfeld. As stated above, Langenfeld has not submitted any evidence creating a genuine issue of fact on the latter question.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Stoelting's motion for summary judgment is granted and the case dismissed.