**ESTATE OF James PHILLIPS III and, Raye M. Phillips, Special Administratrix of the Estate of James Phillips III, and on her own behalf, Plaintiffs,**

v.

**CITY OF MILWAUKEE, Philip Arreola, Theodore Busch, Robert Duarte, Dennis Hintz, Mary Riley, James Rice, and Harold Ray Schmidt, Defendants.**

No. 94–C–0999.

United States District Court, E.D. Wisconsin.

April 24, 1996.

Thomas E. Hayes, Nathaniel D. Rothstein, Rothstein Law Offices, Ronald C. Shikora, Shikora Law Office, Milwaukee, WI for plaintiffs.

Grant F. Langley, Susan E. Lappen, Milwaukee City Attorney's Office, Milwaukee, WI for defendants.

## DECISION AND ORDER

WARREN, Senior District Judge.

Before the Court is Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment. On November 1, 1995, the Estate of James Phillips, III and Raye M. Phillips filed a Motion for Partial Summary Judgment. On November 15, 1995, the City of Milwaukee, Police Chief Philip Arreola, and Milwaukee Police Officers Theodore Busch, Robert Duarte, Dennis Hintz and Mary Riley, filed a Motion for Summary Judgment. For the reasons that follow, the Court concludes that Milwaukee Police Officers Busch, Duarte, Hintz and Riley are entitled to dismissal from suit under the doctrine of qualified immunity and that plaintiff has failed to establish a deprivation of a constitutional right or a policy or custom to support the theory that the City of Milwaukee and its Police Chief may be held liable in this cause of action. Therefore, the Court denies plaintiff's Motion and grants defendants' Motion.

## I. PROCEDURAL BACKGROUND AND FINDINGS OF FACT

This lawsuit results from events that occurred at the Ambassador Hotel in Milwaukee, Wisconsin on May 6, 1993. By way of brief background, on May 6, 1993, Milwaukee Police Officers were called to the Ambassador Hotel in order to remove Mr. James Phillips, III, who had been asked to leave the hotel but had reentered his room. The police officers attempted to engage Mr. Phillips in conversation but he was noncommunicative and clenched two pens in his hands. The officers attempted to remove the pens from Mr. Phillips but he resisted and the police officers brought Mr. Phillips to the ground, handcuffed him behind his back and determined that he should be transported to the

Milwaukee County Medical Complex for medical observation. While Mr. Phillips was on the floor, hand-cuffed and face-down, he stopped breathing. The police officers attempted to perform emergency rescue procedures and when ambulance personnel arrived on the scene they continued with the emergency procedures and transported Mr. Phillips to Sinai Samaritan Hospital. Mr. Phillips died the next day.

Mrs. Phillips, as special administratrix of the estate of James Phillips, her son, and on her own behalf, brought suit against the City of Milwaukee, a municipality, Police Chief Philip Arreola, and Police Officers Theodore Busch, Robert Duarte, Dennis Hintz and Mary Riley. Mrs. Phillips also named in her complaint as defendants, James Rice and Harold Ray Schmidt. Mrs. Phillips brought a civil rights action under 42 U.S.C. § 1983 charging the police officers with misconduct in handcuffing Mr. Phillips and leaving him face down, without adequate supervision, and argues this misconduct was deliberate, intentional, malicious, willful and wanton and violated Mr. Phillips' rights under the Fourth and Fourteenth Amendment of the United States Constitution. Furthermore, the Complaint argues that Police Chief Arreola did not provide the police officers adequate training and supervision which reflected a reckless disregard and/or deliberate indifference toward Mr. Phillips. Finally, Mrs. Phillips brings pendent state law claims charging wrongful death, battery and a survival action.

On November 1, 1995, the plaintiff filed a Motion for Partial Summary Judgment contending that the policies and procedures implemented by the City of Milwaukee and Police Chief Arreola regarding restraining and transporting of individuals constituted unconstitutional municipal policies as a matter of law, and that the unconstitutional policies violated the constitutional rights of Mr. Phillips causing the deprivation of life and liberty without due process of law, cruel and unusual punishment and an unreasonable search and seizure. On November 15, 1995, the defendants' filed a Motion for Summary Judgment arguing that the police officers are entitled to dismissal from this lawsuit under the doctrine of qualified immunity and that

the plaintiff has failed to assert an actionable training and supervision claim against the City of Milwaukee and Police Chief Arreola. The defendants responded to plaintiff's Motion for Partial Summary Judgment on December 1, 1995, contending that the policies, practices and procedures of the Milwaukee Police Department, including its training of officers, are constitutionally sound and had no causal relationship to any injuries sustained by Mr. Phillips. The plaintiff requested and was granted an extension to respond to defendant's Motion for Summary Judgment, and responded on January 2, 1996. Plaintiff submitted a Reply Brief in Support of Plaintiff's Motion for Partial Summary Judgment on January 2, 1996. On January 19, 1996, the defendants filed a Reply Brief in Support of Motion for Summary Judgment. Therefore, the case is fully briefed and ready for review by this Court.

This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1343. The Eastern District of Wisconsin is the proper venue for this cause of action because the claims arise entirely within the geographical boundaries of the Eastern District, in compliance with 28 U.S.C. § 1391(b).

 The Court notes at the outset that factual disputes do not preclude summary judgment based on qualified immunity. The Court must consider factual disputes in a light most favorable to the plaintiff, the nonmoving party, and decide whether, under those facts, defendants' conduct violated law clearly established at the time. Moreover, pursuant to Local Rule 6.05(d), when the nonmoving party fails to respond to the moving party's proposed findings of fact and fails to introduce any evidentiary material, the Court will adopt the factual findings proposed by the moving party. The nonmoving party cannot generally object to the moving party's proposed findings of fact. Rather, the nonmoving party must specifically respond to each disputed finding of fact supported by evidentiary material. *See Langenfeld v. Stoelting, Inc.*, 902 F.Supp. 847, 849 (E.D.Wis.1995).

The Court's findings of fact are the following. Mr. Phillips had stayed at the Ambassador Hotel on occasion. According to Rick

Scott, the general manager of the Ambassador Hotel, Mr. Phillips had engaged in "strange" behavior while a resident at the hotel. For example, Mr. Phillips had placed furniture and clothing in the hallway outside of his room, stuffed his clothing in the bathtub and then proceeded to fill the bathtub with water to the point of overflowing, and threw a chair out of his hotel window. (Scott Depo. at 9–11.) Scott observed that Mr. Phillips' personal hygiene habits were deteriorating and that his room was in a state of disarray with furniture overturned and the carpeting soaked with water from the bathroom. (Scott Depo. at 27–28, 38.) Consequently, Scott determined that Mr. Phillips would be asked to leave the hotel. (Scott Depo. at 38.) While the record is not entirely clear, apparently, Mr. Phillips was asked to vacate his room, room 316, but returned on May 6, 1993, and unbeknownst to the hotel management, reentered his room. Mr. Scott arrived at the hotel around 9:00 a.m. on May 6, 1993, and was informed by Gary Kassin, a security guard at the hotel, that Mr. Phillips was found in his room, attempting to barricade himself in, when housekeeping entered the room to check the condition of the carpeting. (Defendants' Proposed Findings of Fact (DPFOF) ¶ 17; Scott Depo. at 12–13.) While Mr. Kassin was working at the hotel, the head of housekeeping informed him she attempted to check on the condition of the carpeting in room 316 but that there was a naked man in the room and she was scared. (DPFOF ¶¶ 20–22; Kassin Depo. at 14.) Mr. Kassin stated that he knew Mr. Phillips, was aware that he had been occupying room 316, and went to the room where he attempted to coax Mr. Phillips to unlock the door. Mr. Phillips indicated to Kassin that he had paid his rent and wanted to be left alone. Mr. Kassin had another security guard, James Rice, cut the chain on the door and entered the room where he found Mr. Phillips wearing a trench coat, but otherwise naked, and shaking, and noticed further damage to the room. Mr. Kassin asked Mr. Phillips to put on his pants, radioed down to the desk on his walkie-talkie to call the police and sat and waited with Mr. Phillips. (Kassin Depo at 14–18.)

On Thursday, May 6, 1993, at approximately 8:40 a.m., Officers Hintz and Riley received a dispatch to meet a security guard at the Ambassador Hotel regarding trouble with a customer. (DPFOF ¶ 78; Hintz Interrog. at 5; Riley Interrog. at 5.) The desk clerk at the hotel informed the officers about the circumstances leading to the eviction of Mr. Phillips from the hotel and that Mr. Phillips had returned to room 316 and was acting strangely. (DPFOF ¶ 80.) The officers emerged from the elevator on the third floor and were met by hotel security who corroborated the "strange" behavior of Mr. Phillips. (DPFOF ¶ 81.) Upon entering the room, Officer Hintz observed Mr. Phillips wearing a trench coat, no shirt, and trousers that were about to fall down; he appeared unkempt and his clothing was soiled. Mr. Phillips was shaking and sweating. (Plaintiff's Proposed Findings of Fact (PPFOF) ¶ 43.) Officer Hintz walked to the window and observed two fans lying on the parking lot. Officer Hintz asked Mr. Phillips his name, identification and what was "going on" and received no response. The officer asked Mr. Phillips to pull up his pants, and Mr. Phillips complied. (Hintz Interrog. at 5–6.) The observations of Officer Hintz are corroborated by Officer Riley who additionally observed the room in a general state of disarray and asked Mr. Phillips for identification, but Mr. Phillips responded unintelligibly to questions. (Riley Interrog. at 6–7.) Officer Hintz was warned by one the hotel staff to be careful because Mr. Phillips had a ball point pen in each of his hands. (DPFOF ¶ 93; Hintz Interrog. at 6.) Officer Hintz, fearing for the safety of himself and others, grabbed Mr. Phillips' left hand and Officer Riley grabbed his right hand and told Mr. Phillips to drop the pens, but Mr. Phillips resisted and started to struggle and break away. (Hintz Interrog. at 6.) Hintz told Officer Riley to put Phillips on the bed in order to control him and without anyone getting hurt, but Phillips became "extremely violent." (Hintz Interrog. at 6.)

Mr. Phillips became extremely violent, began thrashing his arms and pulling his shoulders and upper body and was attempting to kick, and tried to bite Officer Riley. (Hintz Interrog. at 7.) Officers Hintz and Riley

brought Mr. Phillips to the floor with the help of the hotel staff. The hotel staff held Mr. Phillips legs, while the officers handcuffed Mr. Phillips with two pair of cuffs due to the size of Mr. Phillips. (Hintz Interrog. at 7.) After being cuffed, Mr. Phillips continued to struggle and kick violently, and Officer Hintz decided Mr. Phillips was a person in need of mental observation at a hospital. He used his radio to call for patrol, however, Mr. Phillips continued to struggle and Officer Hintz then decided to call for an ambulance in order to secure Mr. Phillips to a stretcher which would protect him from any injuries he might sustain in the back of a patrol wagon. (Hintz Interrog. at 7; Busch Interrog. at 6.) Officer Riley corroborates these events and added that she requested one of the hotel staff to pull Mr. Phillips' legs out from underneath him in order to bring him to the ground. (PPFOF ¶ 15.) Additionally, Officer Riley put her knee on Phillips' right shoulder blade in order to prevent him from turning over and kicking. (Riley Interrog. at 8; PPFOF ¶ 46.) Mr. Kassin corroborates Officers Hintz and Riley and added that the officers were telling Mr. Phillips that everything would be okay and that they were just going to take him out of the hotel. (DPFOF ¶ 99; Kassin Depo. at 21.) According to Kassin, the officers used a "fine" tone of voice, did not yell, shout or use obscenities and tried to help Phillips. (Kassin Depo. at 21.)

Officer Riley estimated that Mr. Phillips was in a face-down handcuffed position for approximately one minute before Officer Duarte arrived as backup. (DPFOF ¶ 116.) When Officer Duarte arrived he observed the two police officers restraining a black male who was on his stomach, and Officer Duarte began controlling Mr. Phillips feet to prevent him from kicking. (Duarte Interrog. at 6–7; Hintz Interrog. at 7.) Officer Duarte called for an ambulance to transport Mr. Phillips pursuant to Officer Hintz's request. (Duarte Interrog. at 7; Hintz Interrog. at 7.) Officer Busch arrived with leg shackles and put them on the ankles of Mr. Phillips who continued to move his legs. (Busch Interrog. at 5; Hintz Interrog. at 7; Duarte Depo. at 21.) After a few minutes, Mr. Phillips began to calm down and the officers heard the ambu-

lance crew arrive in the hallway. (Hintz Interrog. at 7.) Officer Hintz informed Mr. Phillips that an ambulance had arrived to take him to the hospital, thinking Mr. Phillips would remain calm if he knew he was not going to jail. (Hintz Interrog. at 7.)

The testimony of the police officers, ambulance attendants and witness is not entirely clear regarding exactly who determined Mr. Phillips was a pulseless nonbreather. Two police officers testified that a police officer rolled Mr. Phillips over, but he did not respond and Officer Duarte checked for a pulse but could not find one. (Hintz Interrog. at 7.) Officer Busch and ambulance attendant Edward Meade testified that the ambulance attendants determined Phillips was no longer breathing. The Court will interpret the facts in a light most favorable to the plaintiff, finding that the ambulance attendant, upon arriving on the scene, determined that Mr. Phillips was a pulseless nonbreather. (PPFOF ¶ 20.) Edward Meade and Jay Schiellack, the ambulance attendants, arrived on the scene. They arrived within approximately four minutes of receiving the dispatch to transport a subject for mental observation. (DPFOF ¶¶ 145–46; Meade Depo. at 11.) A period of 30 seconds to one minute transpired from when Busch applied the leg restraints and when the ambulance arrived in the room. (Busch Depo. at 11.) Mr. Meade observed the MPD officers near Mr. Phillips who was in a prone position, he received some basic information from the officers and attempted to ask Mr. Phillips a question, however, Mr. Phillips did not answer; the time that elapsed was "no longer than a minute and a half." (PPFOF ¶ 21; Meade Depo. at 16, 40.) The ambulance attendants were informed that Mr. Phillips had violently struggled but was now more calm and more relaxed. (PPFOF ¶ 54; Schiellack Depo. at 24–25.) Mr. Meade knelt down next to Mr. Phillips, could not see him breathing and could not find a pulse on his wrist or jugular. (PPFOF ¶ 55.) Mr. Meade had the police officers help roll Mr. Phillips over onto his back and noticed that his pupils were nonreactive, felt his chest for any breathing and there was none and made the decision that Mr. Phillips was a pulseless nonbreather.

(Meade Depo. at 17.) Meade left the room to get additional equipment and called paramedics, and when he returned to the room the officers had removed the handcuffs, and there was a handkerchief over Mr. Phillips mouth and it appeared to Meade that an officer had been performing mouth to mouth on Mr. Phillips. (Meade Depo. at 20–1.) During the time period that the ambulance attendants left to get additional equipment, the police officers began administering CPR, Officer Duarte did the breathing and Officer Busch performed the chest compressions. (Busch Depo. at 35–36; Duarte Depo. at 14–17.) When the ambulance technicians returned, they continued administering CPR and chest compressions. (Meade Depo. at 25; Schiellack Depo. at 11.) During the administration of CPR on Mr. Phillips, Officer Busch designated the area a "possible" crime scene and ordered non-police personnel out of the room. (PPFOF ¶ 22; Busch Depo. at 8.) After a few minutes, one of the police officers replaced one of the ambulance technicians and continued administering CPR. (Meade Depo. at 26.) The paramedics arrived after several minutes and took over the care of Mr. Phillips. (Meade Depo. at 26; DPFOF ¶ 155.) Mr. Phillips regained a pulse. (Schiellack Depo. at 26.)

Mr. Phillips was conveyed for treatment to Sinai Samaritan Hospital. (DPFOF ¶ 159.) The admitting diagnosis for Mr. Phillips was a status of pulseless non-breather with subsequent advanced life support and resuscitation. (Kream Depo. at 5.) Mr. Phillips was pronounced dead at 2:50 p.m. on May 7, 1993. (DPFOF ¶ 177.) Mr. Phillips' primary physician was Dr. Steven Kream; his final diagnosis of Mr. Phillips' condition involved and included cardiac arrest, anoxic encephalopathy/probable brain death, thyroid storm, Grave's disease and schizophrenia. (Kream Depo. at 6.) Dr. Kream characterized these conditions as contributing factors leading to the death of Mr. Phillips. (Kream Depo. at 7.) Dr. Kream cannot state whether Phillips' heart stopped first, and then his breathing, or whether Phillips' breathing stopped first, and then his heart. However, his impression was that he had some type of cardiopulmonary arrest and a contributing factor to the cardiopulmonary arrest was the overactive thyroid gland, although it is difficult to specify the exact etiology. (DPFOF ¶ 27.) According to Dr. Kream, when a person experiences a "thyroid storm," his body experiences severe overactivity, including the nervous system and the heart. The body is "revved up," and the person can experience fast speech, rapid pulse, rapid respirations, sweating and running around, and a person can die as a result of a thyroid storm. (DPFOF ¶ 166; Kream Depo at 13, 24–25.)

On or about May 8, 1993, Dr. Jeffrey Jentzen, the medical examiner for Milwaukee County, and Dr. Stormo conducted the autopsy of James Phillips, III. (Jentzen Depo. at 3.) Mr. Phillips was five feet, six-inches tall and weighed 229 pounds. He was described by Dr. Jentzen as an obese individual, of short stature, who had a neck that was extremely short and thick. (DPFOF ¶ 1; Jentzen Depo. at 7.) Mr. Phillips had a pre-existing history of severe schizophrenia and suffered from Graves disease, also referred to as hyperthyroidism (DPFOF ¶¶ 2–3.) According to Dr. Jentzen, Graves disease can cause a hyperthyroid condition which can create, *inter alia,* an abnormal heart rhythm, tachycardia, and an intolerance to heat. (Jentzen Depo. at 15.) The gross examination performed by Dr. Jentzen of Mr. Phillips' indicated his heart was moderately enlarged and his thyroid gland was markedly enlarged due to the disease process. (DPFOF ¶¶ 5, 7; Jentzen Depo. at 14.) The decedent's thyroid gland weighed 180 grams, while a normal thyroid gland weighs 30–60 grams. (Jentzen Depo. at 15–16.) It is Dr. Jentzen's opinion to a reasonable degree of medical probability that the decedent's enlarged heart was related to hypertension or high blood pressure related to his obesity and/or thyroid disease or idiopathic. (Jentzen Depo. at 31–32.) Dr. Jentzen also opined that an individual, including a police officer, observing the decedent would not be able to note that the decedent had an enlarged heart, a diseased heart or an enlargement of the thyroid gland. (Jentzen Depo. at 21–22.) Dr. Jentzen observed a pattern of abrasion around the decedent's wrists which was consistent with the action of fighting the handcuffs. (DPFOF ¶ 180; Jentzen Depo. at 8,

10.) Furthermore, Dr. Jentzen observed an abrasion in the left facial area, which was consistent with a rug burn, and abrasions and a bruise to the right calf, which were consistent with blunt trauma. (DPFOF ¶ 181; Jentzen Depo at 11–12.) The autopsy did not reveal any external injury to the head, scalp or neck region, nor any evidence of bruising or bleeding in tissue, nor any hemorrhaging in body cavities which would indicate a suggestion of trauma. (DPFOF ¶¶ 182, 185–86; Jentzen Depo. at 12–23.) Dr. Jentzen did observe discoloration in the chest area, which was consistent with life support or resuscitative efforts. (DPFOF ¶ 184; Jentzen Depo. at 11–12.)

Dr. Jentzen noted that the immediate cause of Phillips' death, as noted on the death certificate, was "sudden unexpected death associated with law enforcement restraint." This "cause of death" reflected the circumstances at the scene of Phillips' handcuffing, his clinical history, autopsy findings and the disease processes of the individual. (DPFOF ¶ 188; Jentzen Depo. at 17–18.) In addition, Dr. Jentzen noted that Mr. Phillips was not taking his medications for his psychiatric problems. (DPFOF ¶ 189.) Thus the manner of restraint, Phillips' obesity and other physical problems contributed to his death. (DPFOF ¶ 191; Jentzen Depo. at 58–59.) Placing Mr. Phillips in a prone position with his hands handcuffed behind him may have been a contributing factor in Mr. Phillips's death. (Jentzen Depo. at 58.)

The police officers testified that at all times they acted in conformity with the prevailing Milwaukee Police Department (MPD) policy regarding handcuffing and transporting persons. (PPFOF ¶ 51.) There is no specific MPD policy on the appropriate use of force when taking a person in need of mental observation into custody. (DPFOF ¶ 31.) The general policy on the use of force in an arrest situation states "[a] law enforcement officer making an arrest is entitled to use whatever force is reasonably necessary, short of causing death or great bodily harm. Whether that force is reasonable depends upon the totality of facts and circumstances in each case." (Defendants' Appendix at 21; Wisconsin Law Enforcement, Officers Crimi-

nal Law Handbook, at 14.) The totality of facts and circumstances include the known character of the arrestee, the risks and dangers faced by the officer or officers involved and any exigencies of the moment. (*Id.*) MPD officers are trained regarding the warning signs which could predict a possible assault upon officers and are trained regarding how to deal with an emotionally disturbed person. (DPFOF ¶¶ 35–36.) MPD officers are informed that emotionally disturbed individuals are dangerous because they are extremely strong, have a high pain tolerance and perceive that they are fighting for their lives, furthermore, they are unpredictable. (DPFOF ¶¶ 37–38.) The training includes crisis intervention techniques including verbalization skills, how and why to take physical control of an individual and the monitoring of such an individual under physical control. (DPFOF ¶ 39–40.) When taking a subject under physical control, MPD officers are instructed to bring the subject to the ground so as to avoid injury to either the subject or the officer. (DPFOF ¶ 44.) And MPD officers are taught that the proper method of handcuffing is to handcuff an individual with his or her hands behind the back. (DPFOF ¶ 45.) Once the subject is handcuffed, MPD officers are instructed to continue monitoring the subject and are trained to be aware of the tightness of handcuffs once applied. (DPFOF ¶¶ 47–48.) Additionally, it is a MPD policy that leg restraints may be used to secure violent persons, including those placed under emergency detention. (DPFOF ¶ 52.) And individuals in emergency detention must be transported via ambulance. (DPFOF ¶ 55.) MPD officers are trained that they may engage in emergency detention procedures for subjects in need of mental observation. (DPFOF ¶ 54.) MPD officers are trained in the areas of defense and arrest tactics, CPR recertification, first aid, human relations, handling the mentally ill, arrest, search and seizure, and handcuffing. (DPFOF ¶ 59.)

On May 12, 1994, MPD amended its policy to require that officers use "caution and awareness" while constantly monitoring restrained individuals. (PPFOF ¶ 6.) Additionally, as of May 12, 1994, MPD officers are required to roll a restrained person on his

side, as soon as possible, to prevent injury and to facilitate officer monitoring and this policy was not in effect on May 6, 1993. (PPFOF ¶ 7, 52.) This policy was first relayed via a roll call videotape presentation in April of 1993 which stated "[o]nce the subject has been controlled and handcuffed, the officer should roll the subject onto his/her side or into a sitting position as soon as possible." (DPFOF ¶ 53; Appendix 1054.) The police officers were not disciplined by the MPD for their role in the May 6, 1993 events at the Ambassador Hotel. (PPFOF ¶ 59.)

## II. *LEGAL STANDARD*

■ Summary judgment is no longer disfavored under the Federal Rules. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) ("Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole which are designed 'to secure the just, speedy and inexpensive determination of every action.'"). Indeed, Federal Rule of Civil Procedure 56 requires a district court to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; the requirement is that there is a *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.*

■ The party moving for summary judgment bears the initial burden of showing that there are no material facts in dispute and that judgment should be entered in its favor. *Hannon v. Turnage,* 892 F.2d 653, 656 (7th Cir.), *cert. denied,* 498 U.S. 821, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990). A defendant moving for summary judgment may satisfy this initial burden by pointing to a plaintiff's failure to introduce sufficient evidence to support each essential element of the cause of action alleged. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514; *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2553. A party opposing a properly supported summary judgment motion "may not rest upon mere allegations or denials," but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See also Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2554; *Becker v. Tenenbaum–Hill Assoc., Inc.,* 914 F.2d 107, 110 (7th Cir.1990). "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e).

■ In evaluating a motion for summary judgment, the Court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Johnson v. Pelker,* 891 F.2d 136, 138 (7th Cir.1989). "However, we are not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) (citations omitted.)

## III. *ANALYSIS*

### A. *Whether Police Officers Theodore Busch, Robert Duarte, Dennis Hintz, and Mary Riley are Entitled to Judgment as a Matter of Law under the Doctrine of Qualified Immunity.*

■ The doctrine of qualified immunity provides that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known." *Baxter v. Vigo County Sch. Corp.,* 26 F.3d 728, 737 (7th Cir.1994) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Qualified immunity is a judicially created doctrine in-

tended to balance the citizen's statutory or constitutional right against the reality that few "persons will enter public service if such service entails the risk of personal liability for one's official decision." *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). As such, the doctrine provides an *"immunity from suit* rather than a mere defense to liability." *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) (emphasis in original). The availability of qualified immunity "turns on the 'objective legal reasonableness' of the actions taken by the defendants." *Hall v. Ryan*, 957 F.2d 402, 404 (7th Cir. 1992) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987)). Moreover, "[a]ctions taken by local officials are considered objectively unreasonable only if the right allegedly violated is clearly established in a sufficiently particularized sense at the time of the actions at issue." *Id.; Azeez v. Fairman*, 795 F.2d 1296, 1301 (7th Cir.1986) ("The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful."). Thus qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

When immunity from suit is sought by invocation of the doctrine of qualified immunity, the plaintiff has the burden of establishing the existence of a clearly established right. *Liebenstein v. Crowe*, 826 F.Supp. 1174, 1183 (E.D.Wis.1992) (citing *Abel v. Miller*, 824 F.2d 1522, 1534 (7th Cir.1987)). That burden requires the plaintiff to "offer either a closely analogous case

or evidence that the defendants' conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts." *Casteel v. Pieschek*, 3 F.3d 1050, 1053 (7th Cir.1993) (citing *Rice v. Burks*, 999 F.2d 1172, 1173–74 (7th Cir.1993)). *See also McDonald v. Haskins*, 966 F.2d 292 (7th Cir.1992) (holding a gun to the head of a child and threatening to pull the trigger is plainly excessive force, so closely analogous case is not needed to put police officer on notice). Examination of a summary judgment motion based on the doctrine of qualified immunity requires a two-part analysis: (1) Does the alleged conduct violate the plaintiff's constitutional rights?, and (2) If those rights were violated, were the constitutional standards clearly established at the time in question? *Sherman v. Four County Counseling Center*, 987 F.2d 397, 401 (7th Cir.1993). A negative answer to the first question ends the inquiry. *Siegert v. Gilley*, 500 U.S. 226, 231–32, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991).

All claims of excessive force by law enforcement officials are analyzed under the Fourth Amendment.[1] *Lester v. City of Chicago*, 830 F.2d 706, 710 (7th Cir.1987); *Liebenstein*, 826 F.Supp. at 1180; *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1869, 104 L.Ed.2d 443 (1989). The Fourth Amendment provides persons with the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and this right extends to those persons suspected of actual or anticipated criminal wrongdoing. Even when there is no full-scale arrest made, the Fourth Amendment will apply to the officers' conduct as long as the suspect's freedom to

---

1. The plaintiff has invoked the protections of the Fourth Amendment, the Due Process Clause of the Fourteenth Amendment, and the Eighth Amendment of the United States Constitution. The Court will only apply the Fourth Amendment. "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a substantive due process approach.'" *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1988) (making explicit what was implicit in *Tennessee v. Garner* where the

complaint alleged violations of both the Fourth Amendment and the Due Process Clause and the Court analyzed the constitutionality of the challenged application of deadly force solely by reference to the Fourth Amendment). Additionally, the Court will not apply the Eighth Amendment's Cruel and Unusual Punishment Clause to the plaintiff's claims because the protections of the Eighth Amendment do not attach until after conviction and sentence. *Ingraham v. Wright*, 430 U.S. 651, 671, n. 40, 97 S.Ct. 1401, 1412, n. 40, 51 L.Ed.2d 711 (1977) ("Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions").

walk away is restrained. *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham*, 490 U.S. at 395, 109 S.Ct. at 1871. The plaintiff's fourth Amendment rights are intact if a court finds that an officer's conduct was "objectively reasonable" in light of the surrounding circumstances. *Id.* at 397, 109 S.Ct. at 1872. Such a determination involves balancing "the nature and quality of the intrusion of the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Lester*, 830 F.2d at 711 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 1699–1700, 85 L.Ed.2d 1 (1985)). The surrounding circumstances which the Court should consider include, but are not limited to, the crime's severity, whether the suspect poses an immediate threat to the officers or to others, and whether the suspect is resisting arrest or is fleeing arrest. *Id.* In judging the "reasonableness" of a particular use of force, the Court must consider "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97, 109 S.Ct. at 1871–72. Therefore, in order to determine whether plaintiff states a Fourth Amendment cause of action, the Court must determine (1) if the police officers' conduct constituted a seizure and (2) whether the seizure was unreasonable. *Donovan*, 17 F.3d at 948. As this Court stated in *Liebenstein*, the legal standards governing the Fourth Amendment and the defense of qualified immunity are the same. The Fourth Amendment requires reasonable conduct on the part of police officers; qualified immunity gives the officer the benefit of the doubt when a civil action is undertaken. *Liebenstein*, 826 F.Supp. at 1184–85.

When reviewing a motion for summary judgment, the Court must interpret the facts in the light most favorable to the plaintiff, the non-movant, when supported by the evidence. The undisputed facts indicate that Mr. Phillips had been asked to leave the Ambassador Hotel and was subsequently found barricaded in his room by Mr. Kassin, a security guard at the hotel, and James Rice. Mr. Kassin described the condition of Mr. Phillips' room as a "disaster area" and informed Mr. Phillips that the police were called and waited with Mr. Phillips in his room. According to Mr. Kassin's uncontroverted deposition testimony, Officers Riley and Hintz arrived on the scene and attempted to engage Mr. Phillips in conversation and asked Mr. Phillips to remove his hands from his pockets. Mr. Phillips was unkempt, shaking, sweating and visibly scared. When Mr. Phillips took his hands out of his pockets, he had a pen clenched in each hand. According to Kassin, Phillips was not "threatening" but he "wasn't going to give [the pens] up to nobody." (Kassin Depo. at 19–20.) Mr. Kassin, a witness to what transpired, described the restraining of Mr. Phillips in his deposition:

> [The police officers said] you're making this a lot harder on yourself, just relax. They were talking—trying to tell him things to do so that they could have got him down on the floor so he wouldn't get hurt or hurt himself because by the struggling he was doing, he wasn't, you know, he was doing more damage than the police officers were doing, you know, they way they brought him down, they were trying to help him you know, so he wouldn't hurt himself and they were just asking him to release the pen and to relax a little bit so they could get him—get the pen out of his arm and get his hands back so they could cuff him.

(Kassin Depo. at 33–34.) The Officers each grabbed a hand of Mr. Phillips in order to release the pens and attempted to get him on the bed, but Mr. Phillips resisted. During the struggle that ensued and escalated, Kassin stated that the officers were telling Phillips "that everything was going to be okay, that they were just going to take him out of the hotel." (Kassin Depo. at 21.) Kassin's testimony is that Officer Hintz was "real nice about everything . . . he . . . wasn't shouting

or yelling or anything" and the officers were "real calm with him, they were calling him by name." (Kassin Depo. at 21, 65.) Mr. Phillips continued to struggle and the officers were having trouble restraining him due to his obesity and strength.

Interpreting the facts in a light most favorable to plaintiff, a member of the hotel staff pulled Mr. Phillips' legs out from under him. Mr. Phillips continued to aggressively struggle. Once Phillips was on the ground, Officer Riley placed her knee on his back in order to get his arm back and handcuff him. Kassin stated that Officer Riley, for approximately thirty seconds, "had her knee like gently sitting on him so he couldn't raise up" but "didn't have her full weight on him because she almost lost her balance." (Kassin Depo. at 28, 55.) Leg restraints were placed on Phillips and the decision was made by the police officers to call an ambulance because the officers were "afraid to take him in a squad car or in a paddy wagon because they were afraid he was going to hurt himself." (Kassin Depo. at 29.) After Phillips had been restrained and was face-down on the ground, Kassin testified that "we're all watching . . . constantly they're watching him because he was struggling so hard we knew he was tired, so we thought he was resting, . . . he was moving a little bit, but you could see him breathing . . . everybody is watching him, . . . watching him laying on the floor." (Kassin Depo. at 30.)

The police officers did not use any type of racially derogatory language or unprofessional terminology toward Mr. Phillips. Moreover, the police officers exhibited appropriate techniques in bringing the struggling subject to the ground in order to handcuff him and remove the pens, which could have inflicted injury on himself, on the officers or on a member of the hotel staff. It is clear to the Court that pens in the hands of a strong individual, who is exhibiting bizarre and unpredictable behavior, could be used as potential striking weapons. The police officers did not strike, hit, punch, kick or use a baton or any other kind of weapon on Mr. Phillips. In fact, the record reveals that the police officers restrained Mr. Phillips as gently as possible, given Mr. Phillips' large size, initial recalcitrance and then violent behavior. Of-

fice Riley testified that once Mr. Phillips was handcuffed, the officers removed forks from his pocket, (Hintz Interrog. at 7; Riley Depo. at 31) although Kassin did not observe the forks. Moreover, once Phillips was on the ground and handcuffed, the officers continued to monitor him by watching him and calling his name. There is no evidence, contrary to the plaintiff's conclusory allegation, that the police officers deliberately ignored Mr. Phillips. The police officers planned to take Mr. Phillips to a hospital instead of jail and ordered an ambulance so that he could be properly transported.

The time frame for how long Mr. Phillips was on the ground is not precise to the exact second, but the record reveals one or two minutes transpired between when Mr. Phillips stopped struggling and the ambulance technician arrived on the scene and determined he was not breathing. Kassin estimates it was a "minute or so" before the officers noticed Mr. Phillips was not breathing. (Kassin Depo. at 38.) The testimony of the police officers and witnesses is not entirely clear regarding the difference between the ambulance crew and the paramedics. Again, interpreting the controverted evidence in a light most favorable to plaintiff, according to Meade and Busch, when the ambulance attendants arrived, the ambulance attendants informed the police officers that Mr. Phillips was a "pulseless nonbreather." (Busch Depo. at 8.) The totality of testimony reflects that a private ambulance service, Curtis–Universal, was called in order to transport Mr. Phillips to the hospital for mental observation. When the ambulance arrived, with emergency medical technicians, it was determined that Mr. Phillips was not breathing and consequently, the ambulance personnel returned to their rig to retrieve the proper CPR equipment and called Milwaukee Fire Department paramedics to assist. When the ambulance personnel left to return to their rig, Officers Duarte and Busch began performing CPR on Mr. Phillips. The ambulance personnel returned with the proper equipment and took over administering CPR. When the paramedics arrived from the Milwaukee Fire Department, they took over the administration of CPR and conveyed Mr.

Phillips to the hospital. These events transpired within a matter of minutes.

The uncontroverted testimony of Kassin, a citizen witness, recounted in detail by the Court, is corroborated by the testimony of Rick Scott, Officers Hintz, Riley, Duarte, Busch and Meade, the EMT technician from the ambulance. The undisputed facts reveal that the police officers restrained an individual who was unkempt and exhibiting bizarre behavior and tightly clenched two ballpoint pens in his fist. Mr. Phillips was extremely resistant to the officers attempts, both verbal and physical, to release his grip on the pens. The more the officers tried to release the pens, the harder Mr. Phillips struggled. The Court finds that the police officers followed appropriate police procedures by first attempting to talk to Mr. Phillips and then followed appropriate police procedures in their restraining and handcuffing of Mr. Phillips given his violent struggle.

The Court concludes a Fourth Amendment seizure occurred when the police officers attempted to restrain Mr. Phillips. *See Brower v. County of Inyo*, 489 U.S. 593, 596–97, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989) (holding a fourth amendment seizure occurs when there is a governmental termination of freedom of movement through means intentionally applied). However, the Court finds the seizure was not unreasonable. It was a reasonable response of the officers to attempt to remove the pens from an individual as large and potentially unpredictable as Mr. Phillips. The officers response was a precautionary measure, appropriate in the context of the surrounding circumstances. Police officers faced with a mentally unstable individual, with a recent history of bizarre behavior, should be able to assess the situation and intervene appropriately without fearing a lawsuit. The police officers realized that Mr. Phillips required mental observation due to his mental and physical condition and put in place the proper procedures to convey Mr. Phillips to the hospital via an ambulance instead of to jail. Once Mr. Phillips was restrained, he seemed to relax, calm down and stopped struggling. Within a matter of minutes, upon the arrival of the ambulance, it was determined that Mr. Phillips was not breathing. The police officers and ambulance personnel began administering CPR until the paramedics arrived and took Mr. Phillips to the hospital. Unfortunately, Mr. Phillips never recovered and died the next day.

Understandably, the plaintiff is searching for an explanation for the death of her son. However, the minor inconsistencies in the various affidavits and overall evidentiary material submitted do not raise a question of material fact as to whether the defendants exhibited excessive force or whether defendants had knowledge of or even a particular reason to expect that, once restrained, Mr. Phillips would no longer be breathing in a matter of minutes. The defendants' lack of knowledge and their exercise of reasonable precautions precludes any possibility of their actions being characterized as callous, deliberate, or criminally reckless. The MPD policy implemented on May 12, 1994 and first relayed via a roll call videotape on April, 1993 requires an officer to roll a restrained person on his side, as soon as possible once the individual has been controlled, in order to monitor the individual. In the instant case, the officers experienced difficulty restraining Mr. Phillips due to his violent struggle, obesity and strength. Once he was restrained, the officers continued to monitor him as the ambulance arrived. The time that elapsed was a matter of minutes and the Court does not find that within those intervening minutes, the police violated Mr. Phillips' constitutional rights by not rolling him on his side or sitting him up, given his unpredictable behavior, prior violent struggle and attempt to injure the officers, and large size. Police officers facing unpredictable and oftentimes dangerous situations must be free to perform their duties utilizing their training, experience and good judgment with confidence that courts will not scrutinize their discretionary decisions with microscopic detail. Having analyzed the officers' conduct, the Court concludes the police officers' actions were objectively reasonable. The doctrine of qualified immunity protects all but the "plainly incompetent or those who knowingly violate the law," and it is clear from the record that under this standard, the Milwaukee Police

Officers are immune from suit. *Malley*, 475 U.S. at 341, 106 S.Ct. at 1096.

 The relevant question in this case is the objective, fact-specific question whether a reasonable officer could have believed that handcuffing an individual behind his back and leaving him face down for no more than two minutes would lead to death. As articulated in *Anderson v. Creighton*, the right an official is alleged to have violated must have been "clearly established" in a particularized sense. *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3038. When the police officers restrained Mr. Phillips, they abided by the policies and practices of the MPD, they had no reason to know or suspect that handcuffing an individual behind his back, face-down could possibly lead to death. Officials who act reasonably should not be held personally liable. Moreover, the Court concludes that the plaintiff has not met her burden of showing that the law was clearly established at the time of the incident so that the individual police officers should have known that they were violating Mr. Phillips's constitutional rights (which this Court has not concluded) when they restrained him. The fact that MPD has since officially modified its policies is not dispositive, state officials are not required to predict the evolution of the law. *See Smith v. Fruin*, 28 F.3d 646, 650 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995) (quoting *Greenberg v. Kmetko*, 922 F.2d 382, 385 (7th Cir.1991)). Mrs. Phillips has failed to allege the violation of a constitutional right that was clearly established at the time of the police officer's actions and has also failed to establish the violation of any constitutional right at all. Although the end result of the police officers' encounter with Mr. Phillips was undeniably tragic, in analyzing the encounter step-by-step, the police officers, in reaction to Mr. Phillips' violent behavior, acted permissibly at every point. In conclusion, Milwaukee Police Officers Busch, Duarte, Hintz and Riley did not violate the constitutional rights of James Phillips and are dismissed from this lawsuit under the doctrine of qualified immunity. The plaintiff has failed to establish a genuine issue as to any material fact, and therefore, defendants are entitled to judgment as a matter of law.

### B. *Whether the City of Milwaukee and Police Chief Philip Arreola are Liable under 42 U.S.C. § 1983.*

 42 U.S.C. § 1983 provides a remedy against "any person" who, under color of state law, deprives another of rights protected by the Constitution.[2] This Court's determination that the individual police officers did not violate Mr. Phillips' Fourth Amendment rights necessarily renders moot the issue of whether the policies of the City of Milwaukee Police Department are unconstitutional. The Supreme Court set forth the elements of a civil rights claim against a municipality in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Under *Monell*, a plaintiff must show (1) that he or she has suffered a deprivation of a constitutionally protected interest, and (2) that the deprivation was caused by an official policy, custom or usage of the municipality. *Id.* at 690–91, 98 S.Ct. at 2036. "If a person has suffered no constitutional injury at the hands of the individual police officer[s], the fact that the department regulation might have authorized the [policy in question] is quite beside the point." *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986); *see also Tom v. Voida*, 963 F.2d 952, 962 (7th Cir.1992). Municipality liability does not attach unless the policy in question actually results in a constitutional violation. *See City of Canton v. Harris*, 489 U.S. 378, 389–92, 109 S.Ct. 1197, 1205–07, 103 L.Ed.2d 412 (1989); *Hirsch v. Burke*, 40 F.3d 900, 904 (7th Cir.1994). Therefore, because the constitutional rights of Mr. Phillips were not violated, the policies of the City of Milwaukee Police Department need not be reviewed for their constitutionality. However, in the in-

---

**2.** The statute states in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983.

terests of completeness, the Court opts to offer such review.

A municipality is liable under 42 U.S.C. § 1983 only if the constitutional deprivation flows from a policy or custom of the local government. *Monell*, 436 U.S. at 690–91, 98 S.Ct. at 2036. The failure to select or implement necessary practices can constitute a "policy or custom" for purposes of a *Monell* § 1983 suit, if that failure causes a constitutional violation. *Collins v. City of Harker Heights*, 503 U.S. 115, 123–24, 112 S.Ct. 1061, 1067–68, 117 L.Ed.2d 261 (1992). In order to prevail, the plaintiff must show that MPD's "failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton*, 489 U.S. at 388, 109 S.Ct. at 1204.

Plaintiffs argue in their Motion for Partial Summary Judgment and Response to defendants' Motion for Summary Judgment that defendants City of Milwaukee and Police Chief Philip Arreola's policies and procedures, regarding restraining and transporting individuals, constitute unconstitutional municipal policies and caused the death of Mr. Phillips. Plaintiff further contends that the MPD failed to adequately train its police officers with respect to restraining the mentally ill. The defendants contend that the City of Milwaukee and Police Chief Arreola were not deliberately indifferent with respect to the training and supervision of its officers and argue that the plaintiff has failed to plead facts to establish a policy or custom to support her theory that the City of Milwaukee may be held liable in this cause of action.

Deliberate indifference is an "elusive standard." *Cornfield by Lewis v. School Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir.1993). Seventh Circuit case law makes clear that deliberate indifference is akin to intentional or criminally reckless conduct. *Salazar v. City of Chicago*, 940 F.2d 233, 237 (7th Cir.1991). However, the standard can be satisfied where "in light of the duties assigned to specific officers or employees the need for more or different training is [ ] obvious, and the inadequacy [ ] likely to result in violation of constitutional rights." *City of Canton*, 489 U.S. at 390, 109 S.Ct. at

1205. Therefore, municipal liability does not attach unless policymakers "have actual or constructive notice that a particular omission [ ] is likely to result in constitutional violations." *Cornfield by Lewis*, 991 F.2d at 1327; *Sims v. Mulcahy*, 902 F.2d 524, 543 (7th Cir.), *cert. denied*, 498 U.S. 897, 111 S.Ct. 249, 112 L.Ed.2d 207 (1990) ("A plaintiff that faults a municipality's inaction must show that there is an 'extremely high degree' of municipal culpability.").

In assessing the policies of the MPD, the plaintiff has failed to meet her burden of establishing that MPD failed to train its police officers and was deliberately indifferent in so failing to train, so that the City of Milwaukee may be held liable. All MPD officers are trained in how to deal with potentially emotionally disturbed individuals, the use of verbalization skills, taking emotionally disturbed individuals into custody for mental observation, handcuffing, use of force, and monitoring an individual when handcuffed. When Officer Hintz and Riley first encountered Mr. Phillips they spoke in a nonthreatening tone of voice and attempted to escort Mr. Phillips out of the hotel. The Officers determined that Mr. Phillips required mental observation and additionally that the pens he grasped in his hands should be removed because he could have harmed himself, the officers or employees at the Ambassador Hotel. Once the encounter turned violent due to the actions of Mr. Phillips, the officers responded appropriately and in compliance with MPD procedures in restraining and handcuffing Mr. Phillips. The testimony of Mr. Kassin attests to the fact that the officers attempted to restrain Mr. Phillips as carefully as possible taking into consideration his obesity, strength and unpredictable violent behavior. Once Mr. Phillips was restrained and on the ground, the police officers appropriately monitored him. He was not hogtied, ignored or left in the back of a squad car or ambulance. Unfortunately, Mr. Phillips died while in police custody, and although the exact cause of death is not ascertainable, the autopsy reveals a number of contributing factors.

The plaintiff attempts to argue that the MPD in 1993 should have been aware of the

potential for "positional asphyxia" and points to five in-custody restraint-related deaths during a 28 month period from 1990 through April 1992, "several other deaths" referred to in Deputy District Attorney Robert Donohoo's March 20, 1991 letter to Chief Arreola and a report from the San Diego Police Department discussing positional asphyxia. Thus the plaintiff argues that Police Chief Arreola should have immediately taught police officers to attempt to place a person on his side or in a sitting position once that person has been restrained and monitor that person's potential medical needs while in restraints. However, none of cases cited by plaintiff, which resulted in the death of an individual while in custody, are similar to Mr. Phillips' circumstances. For example, plaintiff cites to the August 31, 1990 in-custody restraint-related death of Mr. Nicholas Elm, Sr. Mr. Elm died after he was arrested, handcuffed behind his back and placed face-down during transport to a hospital. The cause of death as ruled by the Milwaukee County Medical Examiner was "cocaine psychosis." (Appendix at 314.) Unlike Mr. Elm, who died during transport where the cause of death was cocaine-related, Mr. Phillips was found to be a pulseless nonbreather minutes after he was restrained, was never transported, and a medical autopsy revealed numerous factors that could have caused or contributed to his death. Of the four in-custody deaths referred to by plaintiff, defendants point out that one was the result of natural causes, one involved cocaine ingestion, and the remaining two were suicides. (Appendix at 450.) The Court concludes it is disingenuous to compare the death of Mr. Phillips with these other custody-related deaths.

Plaintiff cites to a 1988 article by Dr. Reay entitled "Effects of Positional Restraint on Oxygen Saturation and Heart Rate Following Exercise" which assessed the effects on peripheral oxygen saturation and heart rate that positional restraint induces when a person is prone, "hog-tied" and placed in the rear compartment of a police patrol car. Hog-tying involves handcuffing behind the back and then bending the individual's secured or shackled legs back in order to connect the handcuffs and shackles. Although "hog-tying was not the critical issue, according to the article, being in a confined space is the problem with regards to positional asphyxia. (Appendix at 314.) In another article on positional asphyxia, Dr. Reay reported on three cases in total across the county where an individual, who was hog-tied and left in a confined space, died. (Appendix at 313, 314.) Mr. Phillips, however, was not hog-tied nor placed in a confined space, and was watched by the police officers while they awaited the arrival of the ambulance. Plaintiff also cites to a study by the San Diego Police Department which established the Custody Death Task Force to study the issue of restraint-related in-custody deaths. Police Chief Arreola responded to the survey conducted by the study on behalf of the Milwaukee Police Department and received the results of the Task Force. The Court cannot find as a matter of law and contrary to the opinion of plaintiff's expert, D.P. Van Blaricom, that a report and an article discussing positional asphyxia were or are sufficient to put the City of Milwaukee, its Police Chief and Officers on notice that the procedures implemented to restrain Mr. Phillips would result in his death. The report of Dr. Reay and the study conducted by the San Diego Police Department discussed the use of hog-tying, the carotid artery choke hold as well as leaving restrained individuals unattended and in confined spaces, like the back of a police patrol car. None of those methods were employed on Mr. Phillips. As the defendants note in their Reply Brief, scholarly studies and articles do not establish the law.

The policies, procedures and training of the MPD were consistent with law enforcement standards approved of by the State of Wisconsin Department of Justice, Division of Law Enforcement Services and the Wisconsin Law Enforcement Standards Board. (Labecki Aff. ¶ 5.) In the instant case, Mr. Phillips was properly handcuffed behind his back with two sets of handcuffs, while in a face down prone position on the floor. This practice was intended to ensure the safety of Mr. Phillips as well as the police officers and employees of the Ambassador Hotel. This police practice is standard across the country. Mr. Phillips was watched by police offi-

cers in the hotel room and within a matter of minutes stopped breathing. Because the police officers had already called an ambulance to transport Mr. Phillips to the hospital, the ambulance personnel were on site and immediately began administering CPR. The plaintiff has failed to assert a specific training deficiency, or enumerate a number of identified deficiencies, known to the City of Milwaukee and Police Chief Arreola, the municipal policymaker, which caused any constitutional deprivation. Moreover, the plaintiff has failed to identify a pattern of unconstitutional conduct so pervasive as to imply actual or constructive knowledge of the conduct on the part of the City of Milwaukee and Police Chief Arreola. Finally, the fact the policies of the MPD have undergone revision does not indicate that preexisting policies were not constitutionally sound. The policies of the MPD were and are consistent with national and state law enforcement standards. The absence of allegations sufficient to establish a "direct causal link between a municipal policy or custom, and the alleged constitutional deprivation," *City of Canton*, 489 U.S. at 385, 109 S.Ct. at 1203, clearly demonstrates that defendants City of Milwaukee and Police Chief Arreola are entitled to summary judgment as a matter of law.

### C. *Whether the moving defendants are entitled to summary judgment on the pendent state law claims.*

The doctrine of pendent jurisdiction permits federal courts to assert jurisdiction over an entire action containing both federal and state claims. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The Court in considering whether to address state law claims must embark upon a two-step analysis: first, the federal and state claims must "derive from a common nucleus of operative facts" and be "such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding;" second, courts are required to weigh case-by-case the values of convenience to the parties, fairness, judicial economy, and comity before deciding to exercise its jurisdictional power. *Id.* at 725, 86 S.Ct. at 1138. With the resolution of all of plaintiff's federal claims, it is within the

Court's discretion to dismiss the remaining state law claims, however, dismissal is not required if the correct disposition of the pendent state law claims is clear as a matter of state law and addressing the claims would resolve the cause of action without further trial proceedings and without having to interpret any unsettled area of Wisconsin law. *See Weinberger v. State of Wisconsin*, 906 F.Supp. 485, 493 (W.D.Wis.1995). Thus the Court opts to retain jurisdiction over the remaining state law claims in the interests of judicial economy and because the law of Wisconsin, regarding the remaining state claims, is well-settled and allows easy resolution.

The defendants argue that the officers are entitled to summary judgment with regard to any remaining state law claims under Wisconsin law which provides in pertinent part that no suit may be brought against any government "officers, officials, agents or employees for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." Wis.Stats. § 893.80(4). "The general rule acknowledged in Wisconsin is that a public officer or employee is immune from personal liability for injuries resulting from acts performed within the scope of the individual's public office." *Barillari v. Milwaukee*, 194 Wis.2d 247, 257, 533 N.W.2d 759 (1995) (citations omitted). The statute provides immunity from liability for the discretionary acts of public officers. *Id.* The Wisconsin Supreme Court noted three exceptions which exist to this general rule of immunity: (1) a public officer or employee does not enjoy immunity if he or she engages in conduct which is malicious, willful and intentional; (2) a public officer or employee is not immune from liability if he or she negligently performs a ministerial duty; and (3) a public officer may face liability when he or she is aware of a danger that is of such quality that the public officer's duty to act becomes absolute, certain and imperative. *Id.* at 257–58, 533 N.W.2d 759. The Court concludes that the individual police officers were acting in a discretionary manner and their conduct was not malicious, willful and intentional. Moreover, the officers did not possess the requisite degree of knowledge that after a violent struggle which

resulted in handcuffing Mr. Phillips in a face-down prone position, Mr. Phillips would stop breathing after a few minutes. Once the officers realized Mr. Phillips was not breathing they took immediate action. The undisputed facts demonstrate that the police officers acted conscientiously, carefully and in compliance with police procedures taking into consideration the totality of the circumstances. Thus the Court finds that all of the municipal defendants are immune from this action as a matter of law under Wis.Stats. § 893.80(4). Therefore, the defendants' Motion for Summary Judgment on these counts is granted, and the Court dismisses the pendent state claims contained in the complaint.

### D. *Remaining defendants James Rice and Harold Ray Schmidt*

Plaintiff has listed James Rice and Harold Ray Schmidt as defendants in this lawsuit as well. The record reflects that Mr. Rice was one of the security guards on duty at the Ambassador Hotel during the restraint of Mr. Phillips, however, Mr. Schmidt is not identified anywhere in the record and consequently his connection to the underlying lawsuit is unknown, although the Court speculates he was an employee at the Ambassador Hotel. On November 11, 1994, the plaintiff requested permission to make service of the summons and complaint on James Rice and Harold Ray Schmidt by publication of the summons in the Daily Reporter. The plaintiff made this request after being unable to personally serve or locate these defendants whose last known addresses were in Milwaukee County. The Court granted plaintiff's request on December 12, 1994. The Daily Reporter published the summons on December 23, 1994, December 30, 1994 and January 6, 1995. Because the underlying federal claims creating subject matter jurisdiction have been dismissed against the City of Milwaukee, Police Chief Arreola and the Milwaukee Police Officers, the Court dismisses the claims against Mr. Rice and Mr. Schmidt from federal court.

### IV. *CONCLUSION*

Therefore, entry of summary judgment is in order for the moving defendants because as movants they have established uncontroverted facts entitling them to summary judgment. For the foregoing reasons, the Court holds that the doctrine of qualified immunity applies to claims against the individual police officers, the plaintiff has failed to identify a policy or custom needed to support a 42 U.S.C. § 1983 claim, and the defendants are entitled to summary judgment on pendent state law claims.

**IT IS THEREFORE ORDERED** that the plaintiff's Motion for Partial Summary Judgment is **DENIED** and the defendant's Motion for Summary Judgment is **GRANTED** and this case is **DISMISSED** in its entirety.

**SO ORDERED.**